IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

JULIE AOYAGI,                    ) Civ. No. 14-00285 ACK-RLP
                                 )
        Plaintiff,               )
                                 )
    v.                           )
                                 )
STRAUB CLINIC & HOSPITAL, INC.,  )
                                 )
        Defendant.               )
_____)

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

        For the following reasons, the Court hereby GRANTS
Defendant Straub's Motion for Summary Judgment on all claims in
the First Amended Complaint.

FACTUAL BACKGROUND

        This case arises from Plaintiff Julie Aoyagi's
employment with Defendant Straub Clinic and Hospital ("Straub").
Plaintiff is "of Hispanic (Costa Rican) ancestry and over the age
of fifty." (FAC ¶ 6.) Plaintiff was born in Costa Rica, but moved
to the United States in 1971. (Def.'s CSF, Zorc Decl., Ex. MM
("Pl. Depo.") at 17.) She is currently 56 years old. (Pl. CSF ¶
7.)

I.    Plaintiff's Work History at Straub

        Plaintiff began her employment at Straub in January
2009, when she was hired as an Administrative Secretary in
Hospital Operations. (FAC ¶ 8.) In this position, Plaintiff was

required to "provide[] overall administrative support for the department[, and w]ork[] with multiple priorities and projects in a fast-paced environment, with strong attention to detail and excellent customer service skills." (Id. at 27-28 & Ex. 5.)

Plaintiff was supervised by Glenda Kaalakea, the Director of Hospital Operations, from 2009 to around April of 2012. (Pl. Depo. at 30.) Kaalakea is part Korean and part Caucasian and is currently 69. (Id. at 29; Def.'s CSF, Kaalakea Decl. ¶ 3.) Plaintiff initially did not sit on the same floor as Kaalakea, and was issued a pager with which Kaalakea got in touch with Plaintiff if she needed assistance. (Id. at 40-41.) Plaintiff states that she and Kaalakea had a mutual understanding that if Plaintiff worked late on a particular day, she would be allowed to come in later the following day. (Id. at 161-62.) In addition to providing support to Kaalakea, Plaintiff was also required to support other managers, including Kate Woodard, who became Manager, Hospital Operations in around May of 2010. (Pl. Depo. at 30-31, 39, 152-53.) Woodard is Caucasian but was raised in the Philippines; she is currently 48 years old. (Id. at 32; Woodard Decl. ¶ 3.)

Starting in 2010, Plaintiff began applying for different jobs within Hawaii Pacific Health ("HPH") (the parent entity of Straub). (Pl. Depo. at 47, 288.) Kaalakea supported Plaintiff's efforts to transfer, and approved payments by Straub

2

to Plaintiff to pay for courses to help her qualify for a position in coding. (Id. at 45-47, 52-53, 288.) While she was reporting to Kaalakea, Plaintiff applied for five positions; however, all of those applications were unsuccessful. (Id. at 287-90.)

## II. Plaintiff's Problems with Woodard and Negative Performance Evaluations

Plaintiff apparently began having problems with Woodard in November of 2010, when Woodard moved into Plaintiff's office. (Pl. Depo. at 53.) Plaintiff states that Woodard spoke to her condescendingly about ordering supplies and coordinating Woodard's office move. (Id. at 53-57.) In January of 2011, Kaalakea informed Plaintiff that Woodard had given Kaalakea a document with notes of Plaintiff's phone conversations. (Id. at 57-60.) Woodard states that she had prepared the document summarizing some of Plaintiff's calls because she was distracted by Plaintiff's practice of having numerous personal phone conversations at her desk during work hours. (Def. CSF, Woodard Decl. ¶ 5.) Woodard prepared the notes to discuss the issue with Kaalakea. (Id.) Many of the conversations appeared to be with Plaintiff's co-workers, Koleman and Tiffany, with whom Plaintiff often socialized. (Id., Ex. GG.)

At around the same time, Plaintiff was also apparently exchanging numerous personal e-mails with Koleman during the work day, including some in which Plaintiff used the term "WOP" to

refer to Woodard. (Pl. Depo. at 232-42; 251-54 & Exs. 27-32.) Plaintiff states that she is aware that "WOP" is a derogatory slur; however, she stated during her deposition that she and Koleman used the term "WOP" as an acronym for "warden on patrol." (<u>Id.</u> at 234-35.)

Plaintiff states that, in March of 2011, when Plaintiff "had to set up a meeting and there was some issues with it," Woodard told her that the younger administrative secretaries were more tech savvy and more aware of new trends than Plaintiff. (<u>Id.</u> at 136-37.) Plaintiff believed that Woodard was referring to her younger co-workers, Ermenia Aflague and Stefany Tengan. (<u>Id.</u>) Plaintiff also states that, in June of 2011, Woodard told her that Plaintiff didn't understand instructions because English was her second language, and that she spoke to Plaintiff condescendingly and told Plaintiff that she was not professional enough, and did not have the critical skills necessary, to be working in that environment. (<u>Id.</u> at 72, 135, 140.)

On September 16, 2011, Kaalakea issued Plaintiff a Documented Oral Warning for tardiness, attendance, and inadequate work performance. (Pl. Depo. at 151-52 & Ex. 14.) Kaalakea states that two managers (one of whom was Woodard) had complained to her about Plaintiff's resistence to doing work for them. (Def. CSF, Kaalakea Decl. ¶ 5.) In addition, Plaintiff had been late for work numerous times in August. (<u>Id.</u>) Plaintiff acknowledged that

4

Kaalakea had noted Plaintiff's misspellings and failure to proofread her work several times, and was becoming frustrated with Plaintiff's proofreading errors. (Pl. Depo. at 158.)

A few days later, on September 23, 2011, Woodard confronted Plaintiff in front of Keith McCloskey, an outside vendor, about double-booking Kaalakea when Woodard was supposed to meet with her. (Id. at 141-46.) Plaintiff states that Woodard was "very, very mean" and told Plaintiff that she did not have the critical thinking skills to do her job. (Id. at 145.) After this confrontation, on the same day, Plaintiff called the hotline for the Compliance Department and made a verbal complaint about Woodard. (Id. at 184-85, 63.) Plaintiff stated in the complaint that Woodard was being condescending, harassing, and belittling Plaintiff, and "being very hostile." (Id. at 185; Pl. Depo., Ex. 9 at 3.) In her September 2011 complaint through the hotline, Plaintiff did not mention any discrimination or harassment on the basis of race or age. (Pl. Depo. at 79-80, 184-87 & Ex. 9 at 3, 9.) Kaalakea states that she investigated Plaintiff's complaint and concluded that Woodard had simply been very stern with Plaintiff. (Def. CSF, Kaalakea Decl. ¶ 12.)

On March 30, 2012, Plaintiff received a Written Warning for inadequate work performance issued by Kaalakea. (Pl. Depo. at 175-177 & Ex. 17; Def. CSF, Kaalakea Decl. ¶¶ 7-9.) Among other issues, the Written Warning addressed a complaint by Art

5

Gladstone, Chief Operating Officer, about Plaintiff's repeated
failure to set up the New Employee Facility Orientation
correctly. (Kaalakea Decl. ¶ 8; Pl. Depo. Ex. 17.) The Written
Warning also again addressed Plaintiff's repeated failure to
proofread documents, and reluctance to provide support for other
managers, notwithstanding the fact that it was her job to do so.
(Kaalakea Decl. ¶ 9; Pl. Depo. Ex. 17.)

        In April of 2012, Plaintiff was reassigned to report to
Woodard, due to Woodard's "expanding scope of responsibility as a
Manager, Hospital Operations, and the resulting need for
additional administrative support." (Def. CSF, Kaalakea Decl.
¶ 10.) Plaintiff states that, sometime in early 2012, Kaalakea
told her that Woodard wished to replace Plaintiff with "someone
like Jonica" Caldwell. (Pl. Depo. 92-93, 149-50, 265-69.)
Caldwell is Caucasian. (<u>Id.</u>) Plaintiff states that, in June of
2012, Woodard called her "incompetent" for failing to order food
for a meeting. (<u>Id.</u> at 111-15.)

        On September 14, 2012, Woodard and Kaalakea met with
Plaintiff regarding her continued unsatisfactory performance.
(Pl. Depo. at 187-92 & Ex. 18.) During the meeting, Woodard told
Plaintiff that her performance was unsatisfactory and that she
did not have the critical thinking skills to do her job well.
(Pl. Depo. at 190.) Woodard and Kaalakea offered Plaintiff two
choices: (1) to continue in her current position but receive an

annual performance appraisal stating that the essential job
functions were not met and disciplinary action would be taken; or
(2) to resign from her position by submitting a letter of
resignation, after which Plaintiff would be given until December
31, 2012 to look for other work either internally or externally.
(Id. at 187-90 & Ex. 17.) At Plaintiff's request, a summary of
the meeting was made in writing in an email from Woodard to
Plaintiff on September 18, 2012. (Pl. Depo., Ex. 17.)

Plaintiff agreed to resign and provided a letter of
resignation on September 18, 2012; however, she rescinded her
resignation the next day. (Pl. Depo. at 192-200 & Exs. 19 & 20.)
Plaintiff was therefore provided her written performance
evaluation on September 18, 2012, indicating that she had an
overall rating of "unsatisfactory." (Pl. Depo. Ex. 21.) Plaintiff
subsequently provided a written rebuttal to the performance
evaluation, stating, among other things, that the poor
performance evaluation was written by Woodard in retaliation for
Plaintiff's complaint about Woodard in September of 2011. (Id.
Ex. 21.) Plaintiff did not assert that Woodard had discriminated
against her on the basis of her race or age in the rebuttal.
(Id.)

### III. Plaintiff's Leave of Absence

On September 25, 2012, Plaintiff took a medical leave
of absence, which was extended several times. (Pl. Depo. at 205-

7

07.) Plaintiff states that she was diagnosed with Post-Traumatic Stress Disorder. (<u>Id.</u> at 204.) Plaintiff emailed Woodard and Kaalakea on Friday, January 11, 2013, informing them that she would be returning to work the following Monday. (Pl. Depo., Ex. 23.) During Plaintiff's leave of absence, unsure as to whether Plaintiff would return to work, Woodard and Kaalakea had arranged for a temporary employee, Jennifer Patenia, to step in and assist in Plaintiff's role. (Pl. Depo. at 207; Def. CSF, Woodard Decl. ¶ 8.) Patenia continued to work as a temporary employee after Plaintiff's return to assist with Kaalakea's need for secretarial support. (<u>Id.</u> ¶ 9.)

### IV.  Plaintiff's Return to Work in 2013

Upon Plaintiff's return to work on January 14, 2013, Woodard provided her with a written outline of expectations regarding Plaintiff's performance in her position. (Pl. Depo., Ex. 24.) Plaintiff states that she did not disagree with any of the outlined expectations. (Pl. Depo. at 208.) Plaintiff was also suspended for one day without pay on January 15, 2013 as a disciplinary measure for her inadequate performance before her leave of absence. (<u>Id.</u> at 208-09 & Ex. 25.)

Plaintiff states that, upon her return to work, she no longer had a desk, computer, or phone, and was therefore unable to do her job. (<u>Id.</u> at 321-22.) Plaintiff also states that Woodard told her that she had been replaced by Patenia. (<u>Id.</u> at

8

323-24.)

On March 23, 2013, Plaintiff was issued a Written Warning by Woodard, again regarding her excessive tardiness. (<u>Id.</u> at 211-218 & Ex. 34.)

In July of 2013, Plaintiff voluntarily transferred to an Administrative Secretary position in the Imaging Department.[1] (<u>Id.</u> at 34, 276.)

**V.   Plaintiff's Internal Job Applications**

During the course of her employment as an Administrative Secretary in Hospital Operations, Plaintiff continued to apply for other positions within HPH. Plaintiff states that she was rejected from fifteen positions,[2] and contends that these rejections were in retaliation for making her September 2011 complaint about Woodard. (Pl. Depo. at 289.) Plaintiff believes that she was "black-listed" as a result of her

---

[1] According to her deposition testimony, Plaintiff has since resigned from this position, as she found a "better position" at Queen's Medical Center working as an administrative secretary for more pay. (Pl. Depo. at 35-36.)

[2] Those positions are: Oncology Program Abstractor at Straub, Health Records Technician at Straub, Patient Account Representative at HPH, Coordinator-Office Operations at Kapiolani Medical Center for Women and Children ("KMCWC"), Administrative Secretary in the Pharmacy Department at Straub, Administrative Secretary in the Perioperative Department at Pali Momi Medical Center ("PMMC"), Payment Posting Specialist at HPH, Coordinator-Clinic Operations at Straub, Supervisor for Customer Service at HPH, Case Management Assistant at KMCWC, Ward Clerk at Straub, Coordinator for Office Operations, Administrative Assistant at HPH, Buyer at HPH, and Managed Care Representative at KMCWC. (Pl. Depo. at 296-319.)

complaint about Woodard. (Id. at 291-95.)

Of all of Plaintiff's applications, only two were forwarded to Hiring Managers; Woodard states that she did not speak with either of those Hiring Managers about Plaintiff's applications or qualifications for those positions, or with any other people involved in reviewing applications for the positions for which Plaintiff applied. (Def. CSF, Woodard Decl. ¶ 12.) Additionally, none of the Hiring Managers involved in the decisions for any of the fifteen positions was aware of Plaintiff's 2011 complaint about Woodard. (Def. CSF, Brooks Decl. ¶ 2; Kim Decl. ¶ 2; Hinson Decl. ¶ 7; Pennaz Decl. ¶ 2; Matsuyama Decl. ¶ 2; Keliipio Decl. ¶ 2; Turalva Decl. ¶ 2; Meredith Decl. ¶ 2; Bergen Decl. ¶ 2; Williams Decl. ¶ 2; Tubbs Decl. ¶ 2; Nolan Decl. ¶ 2.)

## VI.  Plaintiff's EEOC/HCRC Charge

On March 4, 2013, Plaintiff dual-filed a Charge with the United States Equal Employment Opportunity Commission ("EEOC") and the Hawaii Civil Rights Commission ("HCRC") for national origin[3] and age discrimination and retaliation. (Pl. Depo. at 63-64 & Ex. 8.) Plaintiff stated to Mary Wunsch, the HCRC investigator, that she did not bring up race or age when she

---

[3] As discussed below, it appears Plaintiff was attempting to bring a charge for race discrimination, and not discrimination based upon her Costa Rican origin.(See Pl. Depo. at 135-36, 277.)

10

complained about Woodard to Compliance in September 2011 because "@ the time, [Plaintiff] didn't think that. [Plaintiff] just thought Kate was mean." (Pl. Depo., Ex. 9 at 9.) Plaintiff did state that Woodard "liked the Caucasian girls better than the ones that were there." (Id.) Plaintiff also stated that no one at Straub had ever made any comments to her about her age or race. (Pl. Depo. at 263.)

Plaintiff's EEOC Charge was dismissed on March 25, 2014, and her HCRC Charge was dismissed on April 8, 2014. (Pl. Depo., Exs. 35 & 36.)

## PROCEDURAL BACKGROUND

On June 20, 2014, Plaintiff filed her Complaint in the instant action. (Doc. No. 1.) Plaintiff then filed her First Amended Complaint on October 9, 2014. (Doc. No. 8.) In the First Amended Complaint, Plaintiff brings claims for violation of Title VII of the Civil Rights Act of 1964 (Count I); violation of the Age Discrimination in Employment Act ("ADEA") (Count II); violation of the Hawaii Whistleblower's Protection Act ("HWPA") (Count III); violation of Hawaii Revised Statutes section 378-2 (Count IV); Intentional Infliction of Emotional Distress ("IIED") (Count V); and a claim for punitive damages (Count VI). On October 31, 2014, Straub filed its Answer to the First Amended Complaint. (Doc. No. 19.)

On June 29, 2015, Straub filed the instant Motion for

Summary Judgment, along with a concise statement of facts and numerous supporting exhibits. (Doc. Nos. 34 & 35.) On September 28, 2015, Plaintiff filed her memorandum in opposition to the Motion, as well as a concise statement of facts and a number of exhibits. (Doc. Nos. 42 & 43.) Straub filed its reply on October 5, 2015. (Doc. No. 44.) A hearing on the Motion was held on October 22, 2015.

## STANDARD

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. Id. at

12

587.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . . or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 585. "[T]he requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247–48 (emphasis in original). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Likewise, the nonmoving party "cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003).

## DISCUSSION

In the instant Motion, Straub asserts that many of Plaintiff's claims are barred as untimely and that, in any case, it is entitled to summary judgment on the merits on all of the

claims in the First Amended Complaint. The Court addresses each argument in turn.

## I.   Timeliness of Plaintiff's Claims

As an initial matter, the Court addresses Straub's argument that Plaintiff's claims regarding conduct that occurred prior to May 8, 2012 are time barred. Where, as here, a plaintiff files charges with both the EEOC and the HCRC, a discrimination charge under Title VII of the Civil Rights Act and the ADEA must be filed with the EEOC within 300 days after the alleged discriminatory event. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 633a(d). Similarly, a charge of discrimination under Hawaii Revised Statutes section 378-2 must be filed with the HCRC within 180 days of the alleged discriminatory act. Haw. Rev. Stat. § 368-11(c). A plaintiff may not seek recovery for discrete discriminatory acts for which no timely charge was filed. <u>See Nat'l Passenger R.R. Corp. v. Morgan</u>, 536 U.S. 101, 110 (2002).

Here, Plaintiff's dual-filed EEOC and HCRC Charge was filed on March 4, 2013.[4/] (Def. CSF, Pl. Depo., Ex. 8.) Thus, Plaintiff's Title VII and ADEA claims are only timely to the extent they are based upon allegedly discriminatory acts that occurred on or after May 8, 2012 (300 days prior to the filing of

---

[4/] Plaintiff states in her opposition to the instant Motion that her EEOC Charge was filed on January 24, 2013, and the HCRC Charge was "dual-filed with EEOC" on February 1, 2013. (Opp'n at 16.) It appears, however, that the Charge was actually file-stamped on March 4, 2013. (Pl. Depo., Ex. 8.)

the EEOC Charge). Similarly, Plaintiff's Hawaii state law claims under Hawaii Revised Statutes section 378-2 are only timely to the extent they are based upon events occurring on or after September 5, 2012 (180 days prior to the filing of the HCRC Charge).

Plaintiff argues, however, that her allegations constitute a hostile work environment claim and, therefore are timely under a theory of continuing violation. Generally, under the continuing violations doctrine, discriminatory conduct contributing to a hostile work environment claim, but falling outside of the statutory time period for filing a claim, may be considered by the Court for purposes of determining liability. Morgan, 536 U.S. at 116-17.

In determining whether a claim is timely, therefore, there is a distinction between discrete acts of discrimination or retaliation, and hostile work environment claims. A discrete act consists of an unlawful practice that "occurred" on the day it "happened," which includes, for example, "termination, failure to promote, denial of transfer, or refusal to hire." Id. at 114. In comparison, hostile work environment claims "are based on the cumulative effect of individual acts," "occur[ ] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Thus, "provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability . . . . the employee need only file a charge within [the relevant time period] of any act that is part of the hostile work environment." Id. at 117-18.

Importantly, however, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. at 113; see also Porter v. California Dep't of Corrections, 419 F.3d 885, 893 (9th Cir. 2004). In determining whether particular events are part of the same actionable hostile work environment claim, the Court considers "whether they were sufficiently severe or pervasive, and whether the earlier and later events amounted to the same type of employment actions, occurred relatively frequently, [or] were perpetrated by the same managers." Porter, 419 F.3d at 893 (quoting Morgan, 536 U.S. at 116).

Here, Plaintiff asserts that the "harassment, discrimination and retaliation predicated [sic] upon [Plaintiff] began on or about January 2001 and continued on through at least May 2013." (Opp'n at 16-17.) Plaintiff does not, however, provide any further clarification as to which specific acts comprise her hostile work environment claim. With respect to Plaintiff's age discrimination claim, this claim appears to be based solely upon

16

Woodard's March 2011 statement that Stefany Tengan and Erminia Aflague were more tech savvy than Plaintiff. (Pl. Depo. at 136-40, 220-22, 270-71; Pl.'s CSF ¶¶ 44-45.) Even assuming this incident does reflect age discrimination, this single statement hardly qualifies as "sufficiently severe or pervasive" to support a hostile work environment claim on the basis of age discrimination. Moreover, there appears to be no allegation of any timely related conduct (i.e., conduct that is discriminatory based on age that occurred within 300 days of the Charge). (<u>See generally</u> Pl.'s CSF.) Thus, the Court rejects Plaintiff's assertion that her age discrimination claim is timely based upon a continuing violation theory.

With respect to Plaintiff's claim of race discrimination,[5/] Plaintiff states that this claim is based upon the following incidents: (1) Woodard's statement in March or April of 2011 that Plaintiff did not understand an instruction because English was her second language (Pl. Depo. at 32-34, 140, 255-57, 263-65); (2) Woodard's statement in June of 2011 that Plaintiff was not professional enough and did not have the

---

[5/] The First Amended Complaint is unclear as to whether Plaintiff is asserting a discrimination claim on the basis of her national origin or on the basis of race. Plaintiff stated during her deposition, however, that she is not claiming she was discriminated against or harassed because of her Costa Rican origin. (Pl. Depo. at 135-36, 277.) The Court therefore construes the First Amended Complaint as bringing a claim for discrimination based upon race, and not national origin.

critical thinking skills necessary to do her job (<u>Id.</u> at 72-77, 265); (3) Woodard's rudeness and statement to Plaintiff on September 23, 2011 that she was incompetent and not capable of handling a calendar when Plaintiff double-booked Kaalakea (<u>Id.</u> at 110-11, 141-48); (4) Kaalakea's statement to Plaintiff in early 2012 that Woodard wanted to replace her with someone like Jonica Caldwell (<u>Id.</u> at 92-93); (5) Woodard calling Plaintiff incompetent in June 2012 because Plaintiff failed to order food for a meeting (<u>Id.</u> at 111-15); (6) Woodard's statement to Plaintiff during a meeting about her performance on September 14, 2012 that Plaintiff didn't have the critical thinking skills to do her job well (<u>Id.</u> at 109-15, 187-200); (7) Woodard's issuance of an Oral Warning for tardiness, attendance, and inadequate work performance (<u>Id.</u> at Ex. 14.); and (8) the September 18, 2012 unsatisfactory performance evaluation (<u>Id.</u> at Ex. 21).

Some of these alleged events did occur after May 8, 2012; thus, the Court must determine whether all of these events constitute one continuing instance of racial discrimination. The Court questions, however, whether any of the timely events (i.e., events after May 8, 2012) involve racial discrimination at all. Rather, it appears that all of the allegations occurring after May 8, 2012 involve performance-based, and not race-based, comments. Notwithstanding Plaintiff's post-facto attempt in her Concise Statement of Facts to characterize many of these

statements as being made "because English was [Plaintiff's] second language," nothing in the actual record documents any race-based comments after May 8, 2012. Rather, Plaintiff's own deposition testimony suggests that the only statement Woodard made regarding Plaintiff's native language was her statement in March or April of 2011 that Plaintiff did not understand an instruction because English was her second language. (Pl. Depo. at 32-34, 140, 255-57, 263-65.) Moreover, Plaintiff admitted during her deposition that no one at Straub ever made any comments to her about her race. (Id. at 263.) The Court therefore cannot conclude that Plaintiff has demonstrated a pattern of race discrimination so severe or pervasive as to satisfy the continuing violations doctrine.

In sum, the Court concludes that Plaintiff has failed to provide sufficient evidence to raise a genuine issue of fact as to the application of the continuing violations doctrine. The various statements made by Woodard between 2011 and 2012 do not reflect an ongoing discriminatory employment practice, and there is no evidence that any timely events were based upon race or age.

As noted above, Plaintiff's dual-filed EEOC and HCRC Charge was filed on March 4, 2013. (Def. CSF, Pl. Depo., Ex. 8.) The Court therefore concludes that it may only consider Plaintiff's Title VII and ADEA claims to the extent they are

based upon allegedly discriminatory acts that occurred on or after May 8, 2012 (300 days prior to the filing of the EEOC Charge), and it may only consider Plaintiff's Hawaii state law claims under Hawaii Revised Statutes section 378-2 to the extent they are based upon events occurring on or after September 5, 2012 (180 days prior to the filing of the HCRC Charge). Further, because Plaintiff's EEOC/HCRC Charge states that September 18, 2012 was the date that the latest discrimination took place, any claims for events occurring after that date are barred for failure to exhaust. See, e.g., B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1099 (9th Cir. 2002).

## II.  Plaintiff's Race Discrimination Claim

While the First Amended Complaint is hardly a model of clarity, in light of Plaintiff's memorandum in opposition to the instant Motion, it appears that in Counts I and IV, Plaintiff is asserting claims under federal and state law[6/] that the race-based harassment that Plaintiff suffered created a hostile work environment. (Opp'n at 17-20.) Even assuming Plaintiff has raised

---

[6/] Plaintiff's memorandum in opposition appears to only address Plaintiff's race discrimination claim under the federal statute, and not Hawaii Revised Statutes § 278-2. Because, however, a nearly identical claim for race discrimination may be brought under the state statute, and because Count IV of the First Amended Complaint alleges an unspecified violation of the state statute, in an abundance of caution, the Court will construe Counts I (the Title VII claim) and IV (the Haw. Rev. Stat. § 378-2 claim) as both alleging a hostile work environment claim based upon race discrimination.

a timely claim for race-based harassment, the Court concludes that Plaintiff has failed to raise a genuine issue of fact such that this claim may survive summary judgment.

### A.    Applicable Legal Framework

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Discrimination under Title VII "encompasses the creation of a hostile work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986) (Title VII guarantees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult"). "Courts have long recognized that a workplace in which racial hostility is pervasive constitutes a form of discrimination." McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113 (9th Cir. 2004).

Similarly, Haw. Rev. Stat. § 378-2(a)(1)(A) makes it an unlawful discriminatory practice "for any employer to . . . discriminate against any individual in compensation or in the terms, conditions, or privileges of employment" because of a person's race. Hawaii courts analyzing a claim of discrimination under Chapter 378 look to federal courts' interpretations of Title VII for guidance. See Arquero v. Hilton Hawaiian Vill. LLC, 91 P.3d 505, 511-12 (Haw. 2004) ("In interpreting HRS § 378-2, we have held that federal courts' interpretations of Title VII ...

21

are persuasive[.]"); see also Shoppe v. Gucci Am., Inc., 14 P.3d 1049, 1058 (Haw. 2000) ("In interpreting HRS § 378-2 in the context of race . . . discrimination, we have previously looked to the interpretations of analogous federal laws by the federal courts for guidance.").

A hostile work environment is one that is permeated with discriminatory intimidation, ridicule, and insult, that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 65–67 (1986)). "To prevail on a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003).

In considering whether the discriminatory conduct was "severe or pervasive," for purposes of the Title VII claim, the Court looks to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." <u>Kortan v. Cal. Youth Auth.</u>, 217 F.3d 1104, 1110 (9th Cir. 2000) (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787–88 (1998)). For purposes of a Hawaii law claim, the "analysis of whether particular harassing conduct was severe and pervasive is separate and distinct from the remaining requirements of a plaintiff's claim: it is the harasser's conduct which must be severe or pervasive, not its effect on the plaintiff or the work environment." <u>Arquero v. Hilton Hawaiian Village LLC</u>, 92 P.3d 505, 512 (Haw. 2002).

Importantly, the Supreme Court has cautioned that "Title VII [is] not . . . a general civility code," and therefore, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." <u>Faragher</u>, 524 U.S. at 788 (citations and quotations omitted).

## B.   Application to Plaintiff's Claims

Here, the Court concludes that Plaintiff has failed to establish a claim for hostile work environment based upon race discrimination. Plaintiff asserts in her memorandum in opposition and her Concise Statement of Facts that she was subjected to "insults and offensive verbal comments of a racial nature" from "at least June 2011 through and including September 2012"; however, an examination of the actual evidence in the record

reveals that the only arguably race-based incidents that occurred are: (1) Woodard's statement in March or April of 2011 that Plaintiff did not understand an instruction because English was her second language, (Pl. Depo. at 32,) and (2) Kaalakea's statement to Plaintiff in early 2012 that Woodard wanted to hire someone like Jonica Caldwell (who is Caucasian) to replace Plaintiff, (id. at 92-93.)

Even assuming these allegations were not barred as untimely (as discussed above), they simply do not amount to the type of "severe and pervasive" conduct required to establish a prima facie case of a hostile work environment. Compare Vasquez v. Cnty. of L.A., 307 F.3d 884, 893 (9th Cir. 2002) (finding no hostile work environment where employee was told that he had "a typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field" and where he was yelled at in front of others), and Sanchez v. City of Santa Ana, 936 F.2d 1027, 1031, 1036 (9th Cir. 1990) (determining no hostile work environment where employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, and kept illegal personnel files on Latino employees), with Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 870 (9th Cir. 2001) (finding hostile work environment where male employee of restaurant was subjected to a relentless campaign of insults,

24

name-calling, vulgarities, and taunts of "faggot" and "fucking female whore" by male co-workers and supervisors at least once a week and often several times a day), and Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1109 (9th Cir. 1998) (finding hostile work environment where plaintiff's supervisor made repeated sexual remarks about the plaintiff over a two-year period, calling her "gorgeous" and "beautiful" rather than her name, telling her about his sexual fantasies and his desire to have sex with her, commenting on her "ass," and asking over a loudspeaker if she needed help changing clothes).

Plaintiff testifies in her deposition that Woodard was insulting and condescending, and told her on several occasions that she was not professional enough, and did not have the critical thinking skills necessary, to do her job. (Pl. Depo. at 72-77, 111-15, 144-45, 187-91.) Importantly, however, these statements are clearly not based upon Plaintiff's race. Rather, they appear to simply reflect Woodard's performance-based criticisms of Plaintiff. Indeed, Plaintiff herself admitted during her deposition that no one at Straub ever made any comments to her about her race.[7] (Id. at 263.) Thus, while

---

[7] During the hearing on the instant Motion, Plaintiff's counsel asserted that Woodard had made comments to Plaintiff about her Hispanic accent. Importantly, however, Plaintiff never stated in her deposition or her declaration in support of her opposition to the instant Motion that any such incident occurred. Rather, the only place in the record that is arguably relevant is
(continued...)

Woodard's comments may have been undiplomatic or uncivil, because they are altogether unrelated to Plaintiff's race, they cannot support her claim of race discrimination under the federal and state statutes. See Surrell v. California Water Svc. Co., 518 F.3d 1097, 1109 (9th Cir. 2008) (upholding the district court's grant of summary judgment on plaintiff's hostile work environment claim where plaintiff's supervisor had confronted her in front of others about failing to perform certain aspects of her job and told her that she was too slow with her work, holding that these comments were "performance related" and not sufficiently severe or pervasive to sustain a hostile work environment claim); Spillane v. Shinseki, Civ. No. 13-00527 HG-RLP, 2015 WL 71502, at *9-10 (D. Haw. Jan. 6, 2015) (granting summary judgment on a plaintiff's hostile work environment claim where "condescending and demeaning" comments were not linked to the plaintiff's race); Gathenji v. Autozoners, LLC, 703 F. Supp. 2d 1017, 1034 (E.D. Cal. 2010) (granting summary judgment on plaintiff's harassment claims where the supervisor's "nasty comment[s,] condescending tone, and the comments about work performance may be offensive,"

---

[7]/(...continued)
in the written report of Mary Wunsch, the HCRC investigator, wherein Ms. Wunsch reports that Plaintiff stated that "Kate mentioned her accent." (Pl. Depo., Ex. 9 at 10.) Even leaving aside the fact that this statement is inadmissible as hearsay if offered for its own truth, a single incidence of Woodard "mentioning" Plaintiff's accent is clearly insufficient to support a hostile work environment claim.

but do not rise to the level of harassment).

In sum, the Court concludes that there is simply no evidence that Plaintiff was subjected to any severe or pervasive conduct of a racial nature. Plaintiff has therefore failed to establish her Title VII or Haw. Rev. Stat. § 378-2 hostile work environment claims based on race discrimination. The Court GRANTS the Motion as to those claims.

## III. Plaintiff's Age Discrimination Claim

Plaintiff also brings a hostile work environment claim based upon age discrimination under the ADEA and, presumably, Hawaii Revised Statutes § 278-2.[8/] (Opp'n at 20-21.)

The ADEA and Hawaii law both prohibit discrimination based on age. 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age"); Haw. Rev. Stat. § 378-2. ("It shall be an unlawful discriminatory practice [b]ecause of . . . age . . . [f]or any employer to refuse to hire

---

[8/] As noted above, based upon the face of the First Amended Complaint, it is difficult for the Court to determine the basis for Plaintiff's ADEA and Hawaii Revised Statutes section 278-2 claims; however, Plaintiff asserts in her memorandum in opposition that she is bringing a "hostile work environment claim . . . under the ADEA." (Opp'n at 21.) Because Hawaii Revised Statutes § 278-2 also encompasses a cause of action for hostile work environment based upon age discrimination, the Court will likewise construe Count IV of the First Amended Complaint as including such a claim.

or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment").

A plaintiff may show violations of these statutes by proving the existence of a hostile work environment. Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1109 (9th Cir. 1991) (hostile work environment claim cognizable under ADEA), superceded by statute on other grounds as recognized by Dominguez-Curry v. Nev. Trans. Dist., 424 F.3d 1027 (9th Cir. 2005); Nelson v. Univ. of Haw., 38 P.3d 95, 106 (Haw. 2001) (hostile work environment claim cognizable under section 378-2); Lalau v. City & Cnty. of Honolulu, 938 F. Supp. 2d 1000, 1016 (D. Haw. 2013) (same).

To assert an age-based hostile work environment claim, a plaintiff must make a prima facie case by demonstrating that "(1) she was subjected to verbal or physical conduct based on age, (2) this conduct was unwelcome, and (3) this conduct was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment." Sai v. H & R Block Enterprises, Inc., Civ. No. 09-00154 SOM-BMK, 2010 WL 520633, at *7 (D. Haw. Feb. 11, 2010)(citing Freitag v. Ayers, 468 F.3d 528, 539 (9th Cir. 2006); Hardage v. CBS Broadcasting, Inc., 427 F.3d 1177, 1187 (9th Cir. 2005)). To be actionable, the environment must be both objectively and subjectively offensive.

When determining whether an environment was sufficiently hostile
or abusive, courts examine all of the circumstances, including
the frequency of the discriminatory conduct, its severity,
whether it was physically threatening or humiliating, and whether
it unreasonably interfered with an employee's work performance.
Faragher, 524 U.S. at 787–88. Simple teasing, offhand comments,
and isolated incidents (unless extremely serious) do not amount
to discriminatory changes in the terms and conditions of
employment. Id. at 788.

Here, Plaintiff has failed to adduce evidence
sufficient to support a claim that her workplace was "permeated"
with hostility sufficiently "severe" or "pervasive" to alter the
conditions of her employment. As discussed above, Plaintiff's age
discrimination claim appears to be based solely on a single
incident during which Woodard told Plaintiff that Stefany Tengan
and Erminia Aflague were more "tech savvy" and "in tune with
what's going on" that Plaintiff. (Pl. Depo. at 136-40, 220-22,
270-71.) Even assuming claims made based upon this statement were
not time barred (as discussed above), as a matter of law this
statement is clearly insufficient to demonstrate discriminatory
animus based upon Plaintiff's age. See, e.g., Lalau, 938 F. Supp.
2d at 1016-17 (holding that "a single comment relating to [the
plaintiff's] national origin, and a single comment relating to
his age . . . is too sparse to support a [hostile work

environment claim.]"). The Court therefore GRANTS the Motion as to Plaintiff's age discrimination claims.

## IV.  Plaintiff's Retaliation Claim

Plaintiff also brings a claim against Straub for retaliation. Title VII makes it unlawful for an employer to retaliate against an employee on the basis of the employee's opposition to practices or actions prohibited by Title VII. See 42 U.S.C. § 2000e-3(a). The ADEA similarly protects from retaliation an employee who has opposed age discrimination, or participated in investigations, proceedings, or litigation concerning age discrimination. See 29 U.S.C. § 626(d). Similarly, Hawaii Revised Statutes section 378-2 makes it unlawful for an employer to "discharge, expel, or otherwise discriminate against any individual because the individual has opposed any practice forbidden by this part or has filed a complaint, testified, or assisted in any proceeding respecting the discriminatory practices prohibited by this part." See Haw. Rev. Stat. § 378-2(2).

To succeed in a retaliation claim under any of these statutes, Plaintiff must demonstrate "(1) that she was engaging in protected activity/opposition, (2) that she suffered an adverse employment decision, and (3) that there was a causal link between her activity and the employment decision." Folkerson v. Circus Circus Enterprises, Inc., 107 F.3d 754, 755 (9th Cir.

1997). The Court concludes that Plaintiff has failed to meet the requirement that she show at least some evidence going to each of those elements.

First, the protected activity must be protected by the statutes Plaintiff sues under. Plaintiff appears to believe that any report of wrongdoing, even wrongdoing that falls outside of what Title VII, the ADEA, and section 378-2 prohibit, may support a retaliation claim under those statutes. She is mistaken. Plaintiff asserts that the protected activity in which she engaged was her September 23, 2011 complaint to the Compliance Hotline regarding Woodard; however, Plaintiff herself admits that the stated grounds for that complaint were that Woodard was "constantly being condescending . . . she was belittling me, being very hostile. That's it." (Pl. Depo. at 79-80, 185 & Ex. 9 at 3.) Plaintiff did not complain about discrimination or harassment on the basis of age, race, or any other protected category. (Id.) Because neither Title VII, the ADEA, nor section 378-2 protects an employee from being retaliated against for complaining about a manager's unfair or condescending behavior that is unrelated to a protected category, Plaintiff's September 2011 complaint simply cannot satisfy the first element of her retaliation claim. See, e.g., Lalau, 938 F. Supp. 2d at 1018 (noting that the first element of a retaliation claim may not be satisfied by a complaint regarding behavior unrelated to a

31

protected category).

Moreover, even if Plaintiff could show that she engaged in a protected activity, she cannot establish a causal link between her September 2011 complaint and the alleged retaliatory acts. Plaintiff asserts that she was subjected to the following adverse employment actions: (1) the poor performance evaluation in September 2012, (2) being pressured to resign in September 2012, (3) being deprived of her desk, computer, and phone and being given "unpleasant and meaningless work" when she returned from medical leave in January 2013, (4) being replaced by a new administrative secretary while she was out on medical leave, and (5) having all of her applications for other internal jobs be rejected. (Opp'n at 26-27.)

As an initial matter, courts generally reject causation for purposes of retaliation claims where the alleged adverse action by the employer occurs months or years after the alleged protected activity. See Clark Cnty School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (per curiam) (stating that where "mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action [is] sufficient evidence of causality . . . the temporal proximity must be very close," and noting that courts have rejected causation where there are three- or four-month time gaps); Manatt v. Bank of Am., NA, 339 F.3d 792, 802 (9th Cir. 2003) (holding that a nine-month

gap between protected activity and adverse employment action "suggests no causality at all"). Here, the first alleged instance of an adverse employment action (the September 2012 performance evaluation) did not occur until a full year after Plaintiff made her September 2011 complaint. The Court therefore cannot infer causation based upon the mere circumstantial evidence that Plaintiff suffered some adverse action at some point after she engaged in the allegedly protected activity. See, e.g., Manatt, 339 F.3d at 802.

Further, Plaintiff has otherwise provided no evidence at all of a causal link between her September 2011 complaint and the alleged adverse employment actions. Indeed, Plaintiff admits that she has no evidence (as opposed to her mere suspicions) that all of her job applications were rejected because of her complaint about Woodard. (Pl. Depo. at 282-319.) Moreover, Straub has provided undisputed evidence that the Hiring Managers for those positions were, in fact, unaware of the complaint and had not spoken with Woodard. (See Def. CSF, Woodard Decl. ¶12; Brooks Decl. ¶ 2; Kim Decl. ¶ 2; Hinson Decl. ¶ 7; Pennaz Decl. ¶ 2; Matsuyama Decl. ¶ 2; Keliipio Decl. ¶ 2; Turalva Decl. ¶ 2; Meredith Decl. ¶ 2; Bergen Decl. ¶ 2; Williams Decl. ¶ 2; Tubbs Decl. ¶ 2; Nolan Decl. ¶ 2.) The Court therefore has no evidence before it, direct or circumstantial, to suggest some causal link between Plaintiff's 2011 complaint and the adverse employment

actions she alleges. The Court therefore GRANTS the Motion as to Plaintiff's retaliation claims.

## V.   Plaintiff's Hawaii Whistleblower's Protection Act Claim

Plaintiff also brings a claim under the HWPA. As an initial matter, because the statute of limitations for claims under the HWPA is two years, any claim under the HWPA that Plaintiff asserts for events before June 2012 is time barred. Haw. Rev. Stat. § 378-63(a).

Even assuming, however, that Plaintiff's HWPA claim is not barred by the statute of limitations, it appears to be premised upon the exact same facts as those of her retaliation claim and therefore must fail on the same grounds as those discussed above.[9/] The Court therefore GRANTS the Motion as to Plaintiff's HWPA claim.

## VI.   Count V: Plaintiff's IIED Claim

Plaintiff also brings an IIED claim in the First Amended Complaint. The Court concludes, however, that Plaintiff's IIED claim is barred by Hawaii's workers' compensation exclusivity provision. That statute provides:

> The rights and remedies herein granted to an
> employee or the employee's dependents on account
> of a work injury suffered by the employee shall
> exclude all other liability of the employer to the

_____

[9/] Indeed, to the extent Plaintiff addresses this claim at all in her memorandum in opposition to the instant Motion, it is solely through a cross-reference to her discussion of the retaliation claim. (See Opp'n at 29.)

employee, the employee's legal representative,
spouse, dependents, next of kin, or anyone else
entitled to recover damages from the employer, at
common law or otherwise, on account of the injury,
except for sexual harassment or sexual assault and
infliction of emotional distress or invasion of
privacy related thereto, in which case a civil
action may also be brought.

Haw. Rev. Stat. § 386-5.

In <u>Yang v. Abercrombie & Fitch Stores</u>, the Intermediate

Court of Appeals of Hawaii held that this exclusivity provision

bars suits against employers for alleged injuries suffered

because of a plaintiff's employment that were caused by the

alleged willful acts of co-employees acting in the course and

scope of their employment. 284 P.3d 946, 956 (Haw. App. 2012).

The Hawaii Supreme Court, however, has declined to apply the

exclusivity provision in section 386-5 to claims based on

discrimination. <u>See</u> <u>Furukawa v. Honolulu Zoological Soc.</u>, 936

P.2d 643, 654 (Haw. 1997); <u>see also</u> <u>Bolla v. University of</u>

<u>Hawaii</u>, 131 Haw. 252, 2014 WL 80554, at *2 (Haw. App. 2014)

("Hawaii state courts have applied the HRS § 386-5 exclusivity

provisions to [intentional infliction of emotional distress]

claims, unless they arise out of sexual harassment, assault, or

discrimination.").

Here, it is unclear what evidence Plaintiff relies upon

to support her claim for IIED. Plaintiff's memorandum in

opposition to the instant Motion does not dispute that her IIED

claim is barred by Hawaii's workers' compensation law, nor,

35

indeed, does the opposition dispute the Motion as to the IIED claim on any other grounds. Even assuming, however, that the IIED claim is based upon Plaintiff's allegations of discrimination and, thus, not barred outright by section 386-5, it nevertheless fails on the merits. To prove IIED under Hawaii law, a plaintiff must show: "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another." Hac v. Univ. of Haw., 73 P.3d 46, 60-61 (Haw. 2003); see also Simmons v. Aqua Hotels & Resorts, Inc., 310 P.3d 1026, 1033 (Haw. App. 2013). "Outrageous" conduct is that "exceeding all bounds usually tolerated by decent society and which is of a nature especially calculated to cause, and does cause, mental distress of a very serious kind." Hac, 73 P.3d at 60. Even viewing the evidence in the light most favorable to Plaintiff, neither Woodard, nor anyone else at Straub, engaged in "outrageous" conduct of the sort necessary to maintain an IIED claim under Hawaii law. Accordingly, the Court GRANTS the Motion as to Plaintiff's IIED claim.

## VII. Plaintiff's Claim for Punitive Damages

Finally, the Court addresses Plaintiff's claim for punitive damages. As an initial matter, this claim must fail because punitive damages are derivative in nature and cannot form an independent claim. See Ross v. Stouffer Hotel Co., 879 P.2d

1037, 1049 (Haw. 1994) ("[A] claim for punitive damages is not an independent tort, but is purely incidental to a separate cause of action."); <u>Television Events & Mktg., Inc. v. AMCON Distrib. Co.</u>, 488 F. Supp. 2d 1071, 1083 (D. Haw. 2006) (dismissing a count alleging "willful, malicious, reckless, and wanton" conduct on the ground that it asserted an independent claim for punitive damages); <u>Campbell v. Hawaii, Dep't of Educ.</u>, Civ. No. 13-00083 DKW, 2014 WL 2803703, at *6 (D. Haw. June 19, 2014) ("A request for punitive damages is not a stand-alone claim, but is rather derivative of [the plaintiff's] other claims."). Thus, because the Court has found that summary judgment is appropriate as against Plaintiff on all of the other claims in the First Amended Complaint, the claim for punitive damage must fail as well.

Moreover, even if the punitive damages claim did not fail as a matter of law because it cannot be brought as stand-alone claim, Plaintiff has produced no evidence to support such a claim. Hawaii law mandates that punitive damages be awarded "only when the defendant has acted egregiously, intentionally, and deliberately, and with 'a character of outrage frequently associated with a crime.'" <u>Kahale v. ADT Auto. Servs., Inc.</u>, 2 F. Supp. 2d 1295, 1302-03 (D. Haw. 1998) (quoting <u>Masaki v. General Motors Corp.</u>, 780 P.2d 566, 569 (Haw. 1989)). A plaintiff may be entitled to punitive damages where she can show "by clear and convincing evidence that the defendant has acted wantonly or

oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." Masaki, 780 P.2d at 575; see also Ngo v. Reno Hilton Resort Corp., 140 F.3d 1299, 1304 (9th Cir. 1998). "[T]he proper measurement of the amount of punitive damages is the degree of the defendant's malice, oppression, or gross negligence that forms the basis for liability for punitive damages and the amount of money required to punish the defendant." Ditto v. McCurdy, 44 P.3d 274, 282 (Haw. 2002).

Here, not only does Plaintiff's punitive damages claim fail as a matter of law because it cannot survive as a stand-alone claim, Plaintiff has also simply failed to make a showing that anyone at Straub acted "wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference," such that Plaintiff may support her claim for punitive damages. See Masaki, 780 P.2d at 575. The Court therefore GRANTS Straub's Motion with respect to Plaintiff's claim for punitive damages.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant Straub's Motion for Summary Judgment on all claims in the First Amended Complaint.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 26, 2015



_____
Alan C. Kay
Senior United States District Judge

Aoyagi v. Straub Clinic & Hosp., Inc., Civ. No. 14-00285 ACK-RLP, Order
Granting Defendant's Motion for Summary Judgment.

39